ORDERED.

**Dated:  March 31, 2022**

Michael G. Williamson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Case No. 8:19-bk-06321-MGW<br>Chapter 7 |
| Haiel Abed Suwaity, | |
|      Debtor.<br>_____/ | |
| Nancy J. Gargula,<br>United States Trustee for Region 21, | Adv. No. 8:20-ap-00268-MGW |
|      Plaintiff, | |
| v. | |
| Haiel Abed Suwaity, | |
|      Defendant.<br>_____/ | |
| Wilson Enterprises International, Inc., et al., | Adv. No. 8:19-ap-00498-MGW |
|      Plaintiff, | |
| v. | |
| Haiel Abed Suwaity, | |
|      Defendant.<br>_____/ | |

Angela Welch,                                           Adv. No. 8:20-ap-00083-MGW
as Chapter 7 Trustee,

      Plaintiff,

v.

Haiel Abed Suwaity,

      Defendant.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## ON OJBECTIONS TO DEBTOR'S DISCHARGE

Bankruptcy's "fresh start"—accomplished through the discharge—is reserved for the "honest but unfortunate debtor." Here, the U.S. Trustee, Chapter 7 Trustee, and a creditor (Wilson Enterprises) contend the Debtor, an elderly immigrant with a sixth-grade education and difficulty reading and writing English, is not an "honest but unfortunate" debtor—and therefore not entitled to a discharge—because he failed to keep adequate books and records from his jewelry wholesale business; is unable to satisfactorily explain what happened to more than $6 million in jewelry he owned and the reason for disbursements from his bank account; made false statements on his bankruptcy schedules; and concealed assets by omitting them from his schedules.

After a three-day trial, the Court concludes that while the Debtor's minimal recordkeeping, which consisted mostly of keeping copies of canceled checks, did not comport with best bookkeeping practices, any failure to keep adequate books and records was justified under the circumstances given (among other things) the Debtor's lack of sophistication, his difficulty reading and writing English, the

2

diminished scale of his jewelry business, and the fact that others in the jewelry wholesale industry do not keep books and records. The Court also concludes the Debtor was able to satisfactorily explain what happened to his loss of assets: He pledged most of the jewelry he owned as collateral; and the revenue he generated from selling jewelry was spent buying more jewelry (to resell) or repaying loans. As for making false statements and concealing assets (by omitting them from his schedules), the Court concludes the Debtor did not do so either fraudulently or knowingly or with the actual intent to hinder, delay, or defraud creditors. Having heard the Debtor's testimony, and observed his demeanor, the Court attributes the false statements and omissions to the Debtor's ignorance, which, in turn, is attributable to his lack of sophistication, education, and English proficiency. The Court therefore concludes the Debtor is entitled to his chapter 7 discharge.

I.    **Findings of Fact**[1]

The Debtor, who is 72 years old, was born and raised in Jerusalem.[2] He went to grade school there, too,[3] though he dropped out by the sixth grade.[4] When he was in his mid-20s, the Debtor moved to the United States.[5]

A.    **The Debtor has trouble reading and writing English.**

When the Debtor came to the United States, he had not had—nor did he receive—any formal training in English.[6] Instead, like many immigrants, he learned to speak English mostly by talking to other people.[7] Still, he has trouble understanding people unless they use simple words.[8] And while he can read English if he takes his time, the Debtor is not 100% literate in English.[9] By most accounts, it is very difficult for him to read and write in English.[10]

---

[1] The trial in this proceeding involved three adversary proceedings that were consolidated for trial. The trial transcripts and trial exhibits were filed in the adversary proceeding filed by the U.S. Trustee: *Gargula v. Suwaity*, Adv. No. 8:20-ap-00268-MGW. All references to adversary docket numbers are to docket numbers in the U.S. Trustee's adversary proceeding.

[2] Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 49, ll. 8 – 18.

[3] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 153, ll. 14 – 19.

[4] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 153, ll. 14 – 19; Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 50, ll. 5 – 6.

[5] Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 49, l. 19 – p. 50, l. 1.

[6] Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 50, ll. 7 – 12.

[7] Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 50, ll. 11 – 12.

[8] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 31, l. 25 – p. 32, l. 15.

[9] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 137, ll. 12 – 18.

[10] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 31, l. 25 – p. 32, l. 4.

### B.    Recently, the Debtor had been engaging in relatively small jewelry transactions as a sole proprietor.

For most of his adult life, the Debtor has been involved in the jewelry business.[11] For years, the Debtor operated Sarasota Estate & Jewelry, which was a jewelry wholesaler.[12] As a jewelry wholesaler, Sarasota Estate & Jewelry bought jewelry and re-sold it.[13]

The company was involved in relatively large jewelry transactions.[14] It was not unusual for Sarasota Estate & Jewelry to be engaged in transactions involving $45,000, $50,000, or $100,000—sometimes the transactions could even total millions of dollars in a month.[15]

In 2010, however, Sarasota Estate & Jewelry filed for chapter 11 bankruptcy.[16] The company was able to confirm a chapter 11 plan.[17] And according to the Debtor, it paid 90% of its debt.[18] But the business closed in 2016 or 2017.[19]

---

[11] Stipulations of Fact and Law, Adv. Doc. No. 54, ¶ 7; Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 50, ll. 13 – 15.

[12] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 63, ll. 5 – 9.

[13] Joint Ex. 72, Adv. Doc. No. 53-22, p. 47, ll. 8 – 25.

[14] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 150, l. 23 – p. 151, l. 4.

[15] Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 29, ll. 3 – 16; p. 57, ll. 4 – 8.

[16] Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 50, ll. 20 – 23.

[17] Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 50, l. 24 – p. 51, l. 1.

[18] Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 51, ll. 2 – 7.

[19] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 63, ll. 10 – 15.

After the business closed, the Debtor continued to operate as a sole proprietor.[20] But he was relegated to working out of his son Mohammed's jewelry store.[21] And the scale of his jewelry business had diminished incredibly.[22] Instead of routinely engaging in transactions involving $45,000, $50,000, or $100,000, like Sarasota Estate & Jewelry had done,[23] the Debtor, as a sole proprietor, was engaging in transactions involving $500, $1,000, and $1,500—and occasionally $10,000 or $12,000.[24]

By 2017, financial troubles, coupled with family disputes, caused the Debtor to basically give up.[25] In 2017, the Debtor's *gross* revenue for the jewelry business had dropped below $100,000, and it was even less in 2018.[26]

### C.    As a sole proprietor, the Debtor transacted business out of his personal bank account.

When the Debtor operated as Sarasota Estate & Jewelry, he conducted business out of a business bank account.[27] And all transactions went through that

---

[20] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 42, l. 23 – p. 43, l. 18.

[21] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 111, l. 23 – p. 113, l. 7.

[22] Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 23, ll. 17 – 23.

[23] Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 29, ll. 3 – 16.

[24] Joint Ex. 9, Adv. Doc. No. 51-9; Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 24, ll. 18 – 25; p. 26, ll. 2 – 13; p. 27, l. 9 – p. 29, l. 16.

[25] Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 74, l. 21 – p. 75, l. 11.

[26] Joint Ex. 72, Adv. Doc. No. 53-22, p. 29, l. 12 – p. 30, l. 21.

[27] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 43, ll. 1 – 6.

account.[28] As a sole proprietor, though, the Debtor conducted most of his jewelry business through his personal bank account at Chase.[29] The Debtor says that every dollar that came in from a jewelry transaction went into his personal Chase bank account.[30]

### D. The Debtor did not understand the need to maintain books and records.

Best bookkeeping practices dictate that jewelry wholesalers like the Debtor generate bills of sale and invoices for each purchase.[31] Jewelry wholesalers should likewise keep records of jewelry pieces obtained on "memo" (which is essentially on consignment).[32] Equally important is keeping an inventory, not the least because it tells a jewelry wholesaler like the Debtor whether he is making money.[33]

The Debtor, however, was not a sophisticated businessman.[34] Because of that, he had a hard time understanding the importance of paper trails.[35] In the Debtor's

---

[28] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 43, ll. 1 – 6.

[29] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 65, l. 20 – p. 66, l. 6; p. 67, l. 24 – p. 68, l. 5; p. 106, ll. 14 – 16; Joint Ex. 46, Adv. Doc. No. 52-21. According to the Debtor's tax returns, his gross sales went from roughly $250,000 in 2015 and $287,000 in 2016 to $94,000 in 2017. Joint Exs. 46 – 48, Adv. Doc. Nos. 52-21 – 52-23.

[30] Joint Ex. 53, Adv. Doc. No. 53-3, p. 14, l. 9 – p. 15, l. 3.

[31] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 20, l. 10 – p. 21, l. 14.

[32] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 22, l. 5 – p. 23, l. 7; Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 121, ll. 4 – 13.

[33] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 19, l. 20 – p. 20, l. 1.

[34] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 17, ll. 1 – 14.

[35] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 17, ll. 1 – 14.

mind, a canceled check was enough evidence that a transaction took place.[36] The Debtor never saw what the big deal was with just keeping copies of checks: if the Debtor had questions about a transaction, he could go to the bank, get a copy of the check, and then call the person who wrote the check or the person to whom the check was made payable.[37]

Not to mention, the Debtor is what you might describe as "old school": he preferred handshake deals;[38] and he was a dinosaur when it came to computers.[39] And, in any event, when it comes down to it, it appears the Debtor just didn't know or understand how to keep records.[40]

### E.    The Debtor primarily relied on bookkeepers to maintain his books and records.

When the Debtor operated Sarasota Estate & Jewelry, he employed Angelica Rios-Gagliardi as a bookkeeper.[41] Although not a CPA, Ms. Gagliardi has a bachelor's degree in forensic accounting (along with a master's degree in international marketing and finance).[42] Ms. Gagliardi also has nearly 30 years of

---

[36] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 17, ll. 1 – 14; Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 59, ll. 11 – 23.

[37] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 24, ll. 4 – 23.

[38] Joint Ex. 72, Adv. Doc. No. 53-22, p. 93, ll. 7 – 20.

[39] Joint Ex. 72, Adv. Doc. No. 53-22 p. 88, ll. 2 – 18.

[40] Joint Ex. 72, Adv. Doc. No. 53-22 p. 88, ll. 2 – 18.

[41] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 15, ll. 16 – 22.

[42] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 16, ll. 2 – 9.

experience,[43] including working for clients in the jewelry business (mostly jewelry wholesalers).[44]

Ms. Gagliardi started working with the Debtor in 2006.[45] She did basic bookkeeping and accounting for him: she recorded business transactions, income, and disbursements; maintained bills of sale; and kept an inventory of the jewelry kept in display cases.[46] As part of her bookkeeping duties, Ms. Gagliardi would create invoices or obtain them from dealers.[47]

When the company filed for chapter 11 bankruptcy, Ms. Gagliardi helped prepare the schedules and financials, as well as the monthly operating reports.[48] Ms. Gagliardi continued to work with Sarasota Estate & Jewelry until after it confirmed its chapter 11 plan.[49] Before she stopped working for Sarasota Estate & Jewelry, Ms. Gagliardi put all the company's records in boxes and labeled the outside of the boxes so the Debtor would know what was in them.[50]

---

[43] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 16, ll. 10 – 24; Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 20 ll. 6 – 17.

[44] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 16, ll. 16 – 24.

[45] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 17, ll. 15 – 20.

[46] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 18, l. 9 – p. 19, l. 19.

[47] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 23, ll. 6 – 16.

[48] Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 20, l. 23 – p. 21, l. 15.

[49] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 17, ll. 21 – 25.

[50] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 25, l. 13 – p. 26, l. 16.

### F.    The Debtor's bookkeeper explained to him the importance of keeping books and records.

Over the years, Ms. Gagliardi says she told the Debtor "hundreds of thousands of times" that he should keep an inventory, bills of sale, and the like.[51] Ms. Gagliardi explained to the Debtor the importance of recordkeeping, and every year, the Debtor would promise to do better—it was his New Year's resolution.[52] But he'd only keep the resolution for a few months and then revert to his old ways.[53]

### G.    The Debtor files for bankruptcy.

Over the years, the Debtor relied on investors to help fund his jewelry wholesale business. Dating back to 2005, the Debtor obtained funding from Richard Gilbert (or entities Mr. Gilbert owned).[54] In all, the Debtor borrowed $1.7 million from Mr. Gilbert, who has since passed away.[55] The Debtor also obtained funding

---

[51] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 20, ll. 2 – 9.

[52] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 23, ll. 16 – 25. The Debtor's son Abed, who worked for his dad for five years or so, likewise believed his dad should be keeping more detailed business records. Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 122, ll. 7 – 11; p. 156, ll. 3 – 7. Abed says he tried to teach his dad how to keep records correctly. Trial Tr. Vol. I, p. 123, ll. 13 – 16. And Abed says his dad knew he should be writing an invoice for every jewelry sale. Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 123, p. 9 – 12. But every time Abed would remind his dad of the need to keep records, the Debtor would tell him "I'll do it, don't worry about it" or "I have the experience, let me do it my way." Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 123, ll. 17 – 19. Eventually, the Debtor and his son would end up arguing about it. Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 123, ll. 24 – 25.

[53] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 24, ll. 1 – 3.

[54] Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 51, l. 13 – p. 52, l. 1.

[55] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 83, ll. 4 – 18; Joint Ex. 36, Adv. Doc. No. 52-11.

from Dr. Gary Kompothecras (whom, presumably because of difficulty pronouncing his last name, everyone calls "Dr. Gary") and Wilson Enterprises International.[56]

The Debtor was paying his investors a significant amount of interest on their loans. For instance, the Debtor was paying Mr. Gilbert eighteen percent interest on his $1.7 million in loans.[57] And according to the Debtor, he was paying Dr. Gary roughly $250,000 in interest per year for the last few years.[58] The Debtor also claims that Wilson Enterprises once charged him $20,000 for interest that had accrued over eighteen days.[59] With sales having diminished to less than $100,000 in 2018,[60] the Debtor could no longer afford the interest payments.[61]

By that point, the Debtor's mortgage lender had sued to foreclose its mortgage on the Debtor's home.[62] Dr. Gary, who held a second mortgage on the Debtor's home to secure loans he had made to the Debtor, had sued to foreclose his second mortgage, too. And, according to the Debtor, Dr. Gary took roughly $600,000 in

---

[56] Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 51, l. 13 – p. 52, l. 1.

[57] Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 52, ll. 2 – 5.

[58] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 98, ll. 1 – 21; Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 52, ll. 2 – 7.

[59] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 54, ll. 16 – 25.

[60] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 111, l. 23 – p. 113, l. 7; Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 24, ll. 18 – 25; p. 26, ll. 2 – 13; p. 27, l. 9 – p. 29, l. 16; Joint Ex. 72, Adv. Doc. No. 53-22, p. 29, l. 12 – p. 30, l. 21.

[61] Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 51, ll. 8 – 12; p. 55, ll. 17 – 22.

[62] Joint Ex. 44, Adv. Doc. No. 52-19.

jewelry (wholesale value) from the Debtor to serve as collateral because the Debtor had not been paying interest.[63]

In January 2019, the Debtor signed a deed in lieu of foreclosure transferring his home to Dr. Gary.[64] Six months later, the Debtor was forced into chapter 7 bankruptcy because of diminished business, coupled with exorbitant interest payments and other financial difficulties.[65]

### H.    The Debtor's books and records are a mess.

When the Debtor called Ms. Gagliardi to tell her he was filing a chapter 7, she discovered all his records were in disarray.[66] She tried to help the Debtor gather up his documents.[67] But, to Ms. Gagliardi, it looked like the Debtor's bookkeepers—the two that came after she stopped working for the Debtor—had no idea how to keep records.[68] So Ms. Gagliardi told the Debtor to give the Trustee the boxes of records because it was going to take hours and hours for her to organize them, and the

---

[63] Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 54, ll. 1 – 8; p. 80, l. 2 – p. 81, l. 25.

[64] Joint Ex. 64, Adv. Doc. No. 53-14.

[65] Joint Ex. 3, Adv. Doc. No. 51-3.

[66] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 25, l. 17 – p. 27, l. 18.

[67] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 29, ll. 3 – 8.

[68] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 29, l. 24 – p. 30, l. 9. One of his bookkeepers had also destroyed some of the old records because she believed the Debtor only needed to keep seven years' worth of records. Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 27, ll. 7 – 18.

Debtor couldn't afford it.[69] The Debtor ultimately turned over the boxes of his records to the Chapter 7 Trustee.[70]

### I.    The Debtor's bookkeeper helps reconstruct the Debtor's business transactions.

While the Debtor's chapter 7 case was pending, the U.S. Trustee asked the Debtor for information relating to twenty-eight deposits into and thirty-six disbursements from his Chase account.[71] When Ms. Gagliardi tried to locate the back-up information for those deposits and disbursements, she discovered that, while she would create invoices in the past when she was working for the Debtor, it did not appear that the new bookkeepers were doing the same.[72] Although Ms. Gagliardi was unable to find invoices, she was able to determine whether a payment was a check or wire transfer; where the transfer went or to whom the check was payable; and what the wire transfer or check was for.[73] From her review of the Debtor's bank records, she was able to ascertain the nature of, and the reason for, the disbursements

---

[69] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 25, l. 17 – p. 27, l. 18.

[70] Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 39, l. 1 – 40, l. 6; Joint Ex. 54, Adv. Doc. No. 53-4, p. 4, l. 11 – p. 5, l. 9.

[71] Stipulations of Fact and Law, Adv. Doc. No. 54, ¶ 18; Joint Ex. 53, Adv. Doc. No. 53-3, p. 25, ll. 5 – 8; Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 75, ll. 12 – 23.

[72] Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 23, l. 6 – p. 28, l. 15.

[73] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 30, l. 24 – p. 31, l. 10.

the U.S. Trustee asked about and put together a spreadsheet reflecting that information.[74]

### J.    The Debtor's schedules were a mess, too.

When the Debtor filed for bankruptcy, he listed more than $6.9 million in assets, which consisted of land worth $100,000 (not the home he deeded to Dr. Gary, which was not scheduled); a car worth $2,000; household goods and furnishings worth $1,400; a 60-inch television worth $200; miscellaneous clothes worth $75; $120 cash in checking and savings accounts; jewelry (a wedding band) worth $200; antique paintings worth $2,000; and roughly $6.8 million in jewelry pledged to others.[75] The Debtor also claimed on his schedules that he held a $75,000 judgment against George and Amy Kane and a judgment in an unknown amount against Mr. Gilbert (and related entities).[76]

On his Statement of Financial Affairs, the Debtor represented that (i) within one year before filing for bankruptcy, he had not had any property foreclosed or repossessed; (ii) within two years before filing for bankruptcy, he had not transferred any property outside the ordinary course of business; (iii) within one year before filing for bankruptcy, he had not stored any property in a storage unit.[77]

---

[74] Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 24, l. 15 – p. 26, l. 7; p. 27, ll. 9 – 12; p. 28, ll. 1 – 15; Joint Ex. 9, Adv. Doc. No. 51-9.

[75] Joint Ex. 5, Adv. Doc. No. 51-5, at 4 – 10..

[76] Joint Ex. 5, Adv. Doc. No. 51-5, at 8.

[77] Joint Ex. 5, Adv. Doc. No. 51-5, at 38 & 40.

During the section 341 meeting of creditors, it became apparent a number of statements on the Debtor's schedules were false. For instance, contrary to the Debtor's Statement of Financial Affairs, the Debtor had transferred his home to Dr. Gary months before he filed for bankruptcy.[78] And, in fact, the Debtor did not have judgments against the Kanes or Mr. Gilbert.[79] The Kanes had a judgment against him,[80] and whatever claim the Debtor had against Mr. Gilbert's estate was stricken as untimely.[81]

It also became apparent during the 341 meeting that the Debtor had omitted property from his schedules. For instance, the Debtor failed to disclose that he had $20,000 worth of jewelry at a safe at his son Kareem's jewelry store.[82] He also failed to disclose that he had a storage unit with antiques and paintings (supposedly) worth $100,000.[83]

### K.    The Plaintiffs object to the Debtor's discharge.

On October 17, 2019, Wilson Enterprises filed an adversary complaint objecting to the Debtor's discharge and seeking to have its debt determined to be

---

[78] Joint Ex. 64, Adv. Doc. No. 53-14.

[79] Joint Ex. 72, Adv. Doc. No. 53-22, p. 52, l. 25 – p. 53, l. 5.

[80] Joint Ex. 72, Adv. Doc. No. 53-22, p. 52, l. 25 – p. 53, l. 5.

[81] Joint Ex. 72, Adv. Doc. No. 53-22, p. 24, l. 25 – p. 26, l. 11; Joint Ex. 63, Adv. Doc. No. 53-13.

[82] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 49, ll. 7 – 24; Trial Tr. Vol. III, Adv. Doc. No. 57-2, p. 97, l. 20 – p. 98, l. 6.

[83] Joint Ex. 72, Adv. Doc. No. 53-22, p. 66, l. 23 – p. 68, l. 23.

nondischargeable.[84] Four months later, the Chapter 7 Trustee sued to object to the

Debtor's discharge.[85] Two months after that, the U.S. Trustee did the same.[86] The

Court consolidated those three adversary proceedings for trial and tried the case over

three days.[87] Having heard the evidence at trial, including the testimony of the

Debtor, the Court must now determine whether to deny the Debtor his discharge.

## II.    Conclusions of Law

Bankruptcy Code § 727 provides twelve grounds for denying a debtor his

discharge.[88] Here, the U.S. Trustee, Chapter 7 Trustee, and Wilson Enterprises

collectively object on four of those grounds: § 727(a)(2)(A), § 727(a)(3), § 727(a)(4),

and § 727(a)(5). The Plaintiffs bear the burden of proving each of their four

objections to the Debtor's discharge by a preponderance of the evidence.[89] After

considering all the evidence at trial, the Court concludes that the Plaintiffs failed to

---

[84] *Wilson Enterprises, International, Inc., et al. v. Haiel Abed Suwaity*, Adv. No. 8:19-ap-00498-MGW, Adv. Doc. No. 1.

[85] *Angela Welch v. Haiel Abed Suwaity*, Adv. No. 8:20-ap-00083-MGW, Adv. Doc. No. 1.

[86] *Nancy J. Gargula v. Haiel Abed Suwaity*, Adv. No. 8:20-ap-268-MGW, Adv. Doc. No. 1.

[87] Wilson Enterprises agreed to bifurcate its nondischargeability claim pending the Court's ruling on the objections to the Debtor's discharge.

[88] 11 U.S.C. § 727(a)(1) – (12).

[89] Fed. R. Bankr. P. 4005 ("At the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the objection."); *Rosenberg Ventures, Inc. v. Velasco (In re Velasco)*, 617 B.R. 718, 727 (Bankr. M.D. Fla. 2020) ("Ordinarily, a creditor bears the burden of proving by a preponderance of the evidence that a debtor is not entitled to a discharge.").

meet their burden of proof under § 727(a)(2)(A), § 727(a)(3), § 727(a)(4), and § 727(a)(5).

**A.     The Plaintiffs' objection to the Debtor's discharge based on § 727(a)(3) should be overruled.**

Section 727(a)(3) provides that the Court may deny the Debtor his discharge if he (among other things) failed to keep or preserve recorded information, including books and records, from which his financial condition or business transactions might be ascertained. To prevail on their § 727(a)(3) claim, the Plaintiffs bear the burden of proving that the Debtor failed to maintain and preserve adequate records.[90] Here, the Court is not convinced the Plaintiffs have met their initial burden of proving inadequate records.

Let's start by acknowledging the obvious: the Debtor's recordkeeping was not consistent with best bookkeeping practices. Ms. Gagliardi testified at trial that best bookkeeping practices dictate that jewelry wholesalers like the Debtor should generate bills of sale and invoices for each purchase;[91] keep records of jewelry pieces obtained on "memo";[92] and maintain an inventory.[93] The Debtor's son Abed, who

---

[90] *In re Velasco*, 617 B.R. at 728 ("For claims brought under §§ 727(a)(3) and (a)(5), the creditor must make a prima facie showing that the debtor has failed to keep or preserve records or has lost assets, at which point the debtor bears the burden of satisfactorily explaining his failure to keep or preserve records or his loss of assets.").

[91] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 20, l. 10 – p. 21, l. 14.

[92] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 22, l. 5 – p. 23, l. 7; Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 121, ll. 4 – 13.

[93] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 19, l. 20 – p. 20, l. 1.

worked for the Debtor for years and owned his own jewelry wholesale business, likewise considered invoices, bills of sale, and memos to be standard business transaction documents.[94] The evidence was undisputed at trial that, since Ms. Gagliardi stopped working for the Debtor, the Debtor did not keep invoices, bills of sale, or memos.

But the standard under § 727(a)(3) is not whether the Debtor followed best bookkeeping practices. The standard under § 727(a)(3) is whether the Debtor's failure to make or keep records makes it *impossible* to ascertain his financial condition and business transactions.[95]

The Court is not convinced that it was impossible to ascertain the Debtor's financial condition or his business transactions. The Debtor's son Abed testified that if he were to review his dad's bank statements, he would more than likely be able to tell if transactions involved the purchase or sale of jewelry.[96] More important, Ms. Gagliardi specifically testified that based on her review of the records the Debtor did keep (mostly canceled checks) she was able to ascertain the nature of his transactions:

---

[94] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 121, ll. 4 – 19.

[95] *Rosenberg Ventures, Inc. v. Velasco (In re Velasco)*, 617 B.R. 718, 728 (Bankr. M.D. Fla. 2020) ("Under § 727(a)(3), denial of a discharge is warranted only when (1) the debtor failed to maintain and preserve adequate books and records; and (2) the debtor's failure to do so makes it impossible to ascertain the debtor's financial condition."); *Wow Sports, Inc. v. Tao Mu (In re Mu)*, 2021 WL 4025304, at *5 (Bankr. S.D. Fla. Sept. 2, 2021) (same); *Crystal Blue, LLC v. Delgado (In re Delgado)*, 2020 WL 4005786, at *8 (Bankr. M.D. Fla. July 14, 2020) (same).

[96] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 156, l. 12 – p. 157, l. 5.

> Q:     Okay. Based on your experience as an accountant, were you able to, through a review of Mr. Suwaity's bank records, ascertain the nature of his transactions.
>
> A:     Yes.[97]

Indeed, from her review of the Debtor's bank records, Ms. Gagliardi was able to put together a spreadsheet reflecting the thirty-six disbursements the U.S. Trustee inquired about.[98] The spreadsheet includes, for each disbursement, the date of the disbursement; how the disbursement was made (wire transfer or check); the amount of the disbursement; to whom the disbursement was made; and the reason for the disbursement.[99] Ms. Gagliardi also notated copies of the Debtor's bank statements.[100]

In addition, in interrogatory answers, the Debtor provided the dates, amounts, and reasons for various transactions identified by the U.S. Trustee;[101] he provided handwritten notes regarding deposits the U.S. Trustee asked about and payments received by him and his son Kareem;[102] he provided handwritten notes regarding (and invoices from) transactions with BBY Diamonds;[103] handwritten notes

---

[97] Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 27, ll. 9 – 12.

[98] Joint Ex. 9, Adv. Doc. No. 51-9.

[99] Joint Ex. 9, Adv. Doc. No. 51-9.

[100] Joint Ex. 8, Adv. Doc. No. 51-8.

[101] Joint Ex. 13, Adv. Doc. No. 51-13.

[102] Joint Ex. 16, Adv. Doc. No. 51-16; Joint Ex. 18, Adv. Doc. No. 51-18; Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 43, l. 8 – p. 44, l. 25.

[103] Joint Ex. 19, Adv. Doc. No. 51-19; Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 45, ll. 1 – 10.

regarding a transaction with Saumil-Diam USA;[104] a handwritten list of, along with an invoice and canceled checks for, transactions with Yes Jewelry;[105] and handwritten notes and canceled checks regarding transactions with Starving Marvin.[106] And, at trial, the Debtor testified about the transactions the U.S. Trustee inquired about.[107]

It is true, as the Plaintiffs point out, that the Debtor lacks back-up documentation beyond bank statements, canceled checks, wire transfer statements, and other documents generated postpetition for the twenty-eight deposits into and thirty-six disbursements from his Chase account. But the Court believes the records the Debtor did keep would allow creditors to reasonably follow the Debtor's transactions and to make intelligent inquiry about the Debtor's financial condition.[108]

---

[104] Joint Ex. 20, Adv. Doc. No. 51-20; Trial Tr. Vol. I, Adv. Doc. No. 57-1, p.45, ll. 11 – 18.

[105] Joint Ex. 22, Adv. Doc. No. 51-22; Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 46, l. 9 – p. 47, l. 7.

[106] Joint Ex. 23, Adv. Doc. No. 51-23; Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 47, ll. 8 – 15.

[107] Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 59, l. 8 – p. 79, l. 7.

[108] *The Cadle Co. v. Leffingwell (In re Leffingwell)*, 279 B.R. 328, 355 – 56 (Bankr. M.D. Fla. 2002) ("[P]erfection in record keeping is not required but creditors examining the records of the debtor must be reasonably able to follow the debtor's business transactions, make intelligent inquiry, verify the oral statements and explanations of the bankrupt, and ascertain the present and past financial condition of the bankrupt [with] substantial completeness and accuracy.") (quoting *Cnty. Nat'l Bank of S. Fla. v. Savel (In re Savel)*, 29 B.R. 854, 856 (Bankr. S.D. Fla. 1983)); *Sackett v. Shahid (In re Shahid)*, 334 B.R. 698, 707 (Bankr. N.D. Fla. 2005) ("While perfect record keeping is not required, the creditors examining the debtor's records 'must be reasonably able to follow the debtor's business transactions, make intelligent inquiry, verify the oral statements and explanations of the bankrupt, and ascertain the present and past financial condition of the bankrupt [with] substantial completeness and accuracy.'") (quoting *In re Leffingwell*, 279 B.R. at 355).

The Court therefore concludes the Plaintiffs failed to prove the Debtor failed to make or keep adequate records.

Even assuming the Debtor did fail to make or keep adequate records, the Court concludes that the Debtor's recordkeeping was justified under all the circumstances of this case.[109] "In determining whether a debtor's inadequate recordkeeping is justified, a trier of fact must consider all of the circumstances of the case."[110] Such justification, as Bankruptcy Judge Jerry Funk explained two years ago in *In re Rumptz*, "depends largely on what a normal reasonable person would do under similar circumstances" considering "the debtor's education, experience, and sophistication" and "any other circumstances that would be considered in the interest of justice."[111]

Here, the Debtor is an elderly immigrant with a sixth-grade education who has difficulty reading and writing English.[112] While the Debtor is technically a

---

[109] *Rosenberg Ventures, Inc. v. Velasco (In re Velasco)*, 617 B.R. 718, 728 (Bankr. M.D. Fla. 2020) ("For claims brought under §§ 727(a)(3) and (a)(5), the creditor must make a prima facie showing that the debtor has failed to keep or preserve records or has lost assets, at which point the debtor bears the burden of satisfactorily explaining his failure to keep or preserve records or his loss of assets."); *Jones v. Rumptz (In re Rumptz)*, 2020 WL 2462528, at *6 (Bankr. M.D. Fla. May 12, 2020) ("Once a creditor shows that a debtor's records are inadequate, the burden shifts to the debtor to justify such inadequacies.").

[110] *In re Rumptz*, 2020 WL 2462528, at *6.

[111] *Id.* (citing *Meridian Bank v. Allen (In re Allen)*, 958 F.2d 1226, 1231 (3d Cir. 1992)).

[112] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 153, ll. 14 – 19; Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 31, l. 25 – p. 32, l. 4; Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 49, l. 8 – p. 50, ll. 5 – 12.

"businessman," his own bookkeeper testified he is "unsophisticated."[113] Because he is unsophisticated, the Debtor primarily relied on Ms. Gagliardi to keep books and records when she worked for him.[114] When she left, the Debtor did employ other bookkeepers, but in Ms. Gagliardi's opinion, it looked like those bookkeepers had no idea how to keep books and records.[115] By that point, the Debtor's jewelry transactions had diminished incredibly: during the two years before filing for bankruptcy, the Debtor was relegated to working out of his son Mohammed's store and generating less than $100,000 in gross revenue in 2017 (down from hundreds of thousands years earlier) and far less than that in 2018.[116] And, according to Ms. Gagliardi, it turns out the Debtor is not alone in failing to make invoices or keep books and records:

> Question:    As a bookkeeper and an accountant, is it your opinion that in this line of work, generating a bill of sale is important?
>
> Answer:    Yes, but also I realized that in the business of wholesale, [the Debtor] wasn't the only one that didn't do them or didn't keep records. I found out that other wholesalers pretty much did the same thing.

---

[113] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 17, ll. 1 – 14.

[114] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 18, l. 9 – p. 19, l. 19; p. 23, ll. 6 – 16.

[115] Trial Tr. Vol. II, Adv. Doc. No. 57-2, p. 29, l. 24 – p. 30, l. 9.

[116] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 111, l. 23 – p. 113, l. 7; Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 24, ll. 18 – 25; p. 26, ll. 2 – 13; p. 27, l. 9 – p. 29, l. 16; Joint Ex. 72, Adv. Doc. No. 53-22, p. 29, l. 12 – p. 30, l. 21.

Thus, taking into consideration the Debtor's level of education, his difficulty reading and writing the English language, his level of sophistication (or lack thereof), the diminished scale of his business, and the lack of recordkeeping in the industry, the Court concludes that, to the extent the Debtor's recordkeeping was inadequate, it was justified under all the circumstances of the case.

Each § 727(a)(3) case must be determined on its own facts.[117] Based on the facts of this case, the Court concludes the Plaintiffs have failed to meet their burden of proving that the Debtor failed to make or keep adequate records from which the Debtor's financial condition and business transactions could be ascertained; and even if the Debtor had failed to make or keep adequate records, the Court concludes that failure is justified under the circumstances of this case. The Court therefore concludes the Plaintiffs' objection to the Debtor's discharge based on § 727(a)(3) should be overruled.

### B. The Plaintiffs' objection to the Debtor's discharge based on § 727(a)(5) should be overruled.

Section 727(a)(5) provides that the Court may deny the Debtor his discharge if he has failed to satisfactorily explain any loss (or deficiency) of assets to meet his liabilities.[118] As is the case under § 727(a)(3), the party objecting to a debtor's discharge under § 727(a)(5) bears the initial burden of coming forward with (in the

---

[117] *Robes v. Moore (In re Moore)*, 559 B.R. 243, 254 (Bankr. M.D. Fla. 2016); *Meininger v. Khanani (In re Khanani)*, 374 B.R. 878, 887 (Bankr. M.D. Fla. 2005).

[118] 11 U.S.C. § 727(a)(5).

case of an objection under § 727(a)(5)) evidence of a loss of assets; once the objecting

party has introduced some evidence of a loss of assets, it is up to the debtor to

satisfactorily explain the loss.[119]

Here, the Plaintiffs have met their burden of coming forward with some

evidence of a loss of assets. For example, the Plaintiffs point out the Debtor pledged

$1 million in jewelry to Dr. Gary and more than $6 million to other creditors.[120] The

Plaintiffs also point out that in the year before this bankruptcy case was filed, the

Debtor made seven payments (or transfers) to his son Kareem totaling $15,765.[121]

That is in addition to $72,000 in wire transfers the Plaintiffs say are unaccounted

for.[122] And while the Debtor claims his average commission on jewelry sales was

between twenty to thirty percent, he persisted that his income for the two years

---

[119] *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir. 1984) ("At trial, the party objecting to a discharge has the burden of proving the objection. But once that party meets the initial burden by producing evidence establishing the basis for his objection, the burden shifts to the debtor to explain satisfactorily the loss.") (citation omitted); *Rosenberg Ventures, Inc. v. Velasco (In re Velasco)*, 617 B.R. 718, 728 (Bankr. M.D. Fla. 2020) ("For claims brought under §§ 727(a)(3) and (a)(5), the creditor must make a prima facie showing that the debtor has failed to keep or preserve records or has lost assets, at which point the debtor bears the burden of satisfactorily explaining his failure to keep or preserve records or his loss of assets.").

[120] Joint Ex. 5, Adv. Doc. No. 51-5; Joint Ex. 7, Adv. Doc. No. 51-7.

[121] Joint Ex. 8, Adv. Doc. No. 51-8. On December 3, 2018, the Debtor made one payment to Kareem in the amount of $1,500 and another in the amount of $500; on December 12, 2018, the Debtor made a $2,000 payment to Kareem; on December 19, 2018, the Debtor made a $665 payment and a $10,000 wire transfer to Kareem; and on March 25, 2019, the Debtor made a $1,000 payment to Kareem. *Id.*

[122] Joint Ex. 17, Adv. Doc. No. 51-17.

before the bankruptcy case was unknown.[123] It is now up to the Debtor to provide a satisfactory explanation for the loss of those assets.

"To be satisfactory, 'an explanation' must convince the judge."[124] Explanations that are vague and indefinite—ones based on estimates uncorroborated by documentation—are not satisfactory.[125] Here, the Debtor has provided a satisfactory explanation (backed up by some documentation) about the loss of his assets.

Start with the pledge of collateral to Dr. Gary. At trial, the Debtor testified that Dr. Gary insisted the Debtor pledge collateral to secure his loan obligations because the Debtor apparently had not been paying interest on the loan.[126] The Debtor testified about the specifics of the jewelry pledged as collateral: it consisted of loose diamond and gem stones—emeralds, rubies, sapphires, etc.—with a wholesale value of at least $600,000.[127] The Debtor testified Dr. Gary had a list of the jewelry that was pledged as collateral.[128] And offered into evidence at trial was a letter from

---

[123] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 79, ll. 20 – 25; Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 96, ll. 11 – 24.

[124] *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir. 1984)

[125] *Id.*

[126] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 83, l. 22 – p. 84, l. 14; p. 96, l. 19 – p. 102, l. 25; Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 51, l. 22 – 52, l. 10, p. 53, l. 20 – p. 55, l. 22; p. 79, l. 14 – p. 82, l. 10.

[127] Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 80, l. 2 – p. 81, l. 25.

[128] Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 80, l. 2 – p. 81, l. 25.

the Debtor's lawyer to a lawyer for Dr. Gary acknowledging that Dr. Gary is holding jewelry as collateral.[129] What's more, the Debtor's son Abed, who had a falling out with his dad, corroborated that Dr. Gary took possession of $600,000 – $700,000 in loose stones as collateral for a loan.[130]

The Debtor likewise testified about his pledge of jewelry to other investors. For instance, the Debtor testified that he pledged around $2.5 to $3 million in jewelry to secure his obligation to repay more than $1.7 million in loans from Richard Gilbert, which were evidenced by a spreadsheet prepared by Ms. Gagliardi, and that (because of appreciation) the jewelry is now worth $6 million.[131] The Debtor explained that the jewelry pledged as collateral comprised jewelry he had personally acquired more than fifteen years ago.[132] The jewelry was pledged as collateral around the time the Debtor acquired it.[133] The Debtor testified that Mr. Gilbert held on to the jewelry as collateral until he died in 2016.[134] And based on the evidence at trial, it appears the Debtor made a claim against Mr. Gilbert's estate to recover the jewelry,

---

[129] Joint. Ex. 41, Adv. Doc. No. 52-16.

[130] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 139, l. 3 – p. 142, l. 12.

[131] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 83, ll. 4 – 18; p. 95, ll. 4 – 18; Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 52, l. 12 – p. 53, l. 1; p. 82, ll. 1 – 19; Joint Ex. 36, Adv. Doc. No. 52-11.

[132] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 87, l. 15 – p. 88, l. 14.

[133] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 87, l. 15 – p. 88, l. 14.

[134] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 87, l. 15 – p. 90, l. 18; Joint Exs. 62 & 63, Adv. Doc. Nos. 53-12 & 53-13.

though that claim was later stricken as untimely.[135] As was the case with the pledge of collateral to Dr. Gary, the Debtor's son Abed corroborated that his dad had pledged millions of dollars of jewelry to Mr. Gilbert (or his entity, Ashland Investment).[136]

As for the more than $70,000 in wire transfers, including the $10,000 wire transfer to the Debtor's son Kareem,[137] Ms. Gagliardi provided a spreadsheet that provides the reason for each transaction. The wire transfers consist of inventory purchases and loan repayments.[138] For instance, the Debtor wired $10,000 to his son to purchase diamond melees (small diamonds), which he likely used to make jewelry.[139]

At bottom, the Debtor's explanation for the loss of assets comes down to a credibility determination. Overall, the Court found the Debtor's explanation for the loss of his assets—which, in some instances, was supported by some documentation and, in other instances, corroborated by his son Abed—credible. Because the Court found the Debtor's testimony credible, it was convinced by the Debtor's explanation.

---

[135] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 87, l. 15 – p. 90, l. 18; Joint Exs. 62 & 63, Adv. Doc. Nos. 53-12 & 53-13.

[136] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 155, ll. 6 – 20.

[137] Joint Ex. 17, Adv. Doc. No. 51-17.

[138] Joint Ex. 9, Adv. Doc. No. 51-9.

[139] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 73, l. 5 – p. 74, l. 6.

Thus, the Court concludes the Debtor has satisfactorily explained the loss of his assets. The Court therefore concludes that the Plaintiffs' objection to the Debtor's discharge based on § 727(a)(5) should be overruled.

### C. The Plaintiffs' objection to the Debtor's discharge based on § 727(a)(4) should be overruled.

Section 727(a)(4) provides that this Court may deny the Debtor his discharge if he knowingly and fraudulently, in or in connection with a case, made a false oath or account.[140] Omission from verified schedules or the Statement of Financial Affairs can not only constitute concealment under § 727(a)(2)(A), but it can constitute a false oath under § 727(a)(4).[141] The evidence at trial was undisputed that the Debtor omitted property and otherwise made false statements on his schedules.

Here are a few examples: as the Plaintiffs point out, the Debtor failed to disclose in his Statement of Financial Affairs that his home had been in foreclosure or that he transferred his interest in the home to Dr. Gary.[142] The Debtor also failed to disclose that, five months before filing for bankruptcy, he pledged (and transferred) $1 million in jewelry to Dr. Gary.[143] While testifying at the section 341 meeting of

---

[140] 11 U.S.C. § 727(a)(4)(A).

[141] *Heartwood 4, LLC v. Tabor (In re Tabor)*, 2022 WL 432716, at *15 (Bankr. S.D. Fla. Feb. 11, 2022) (explaining that "[o]missions from the schedules or SOFA, if knowing and fraudulent, can result in denial of discharge" under § 727(a)(4)(A)); *NSB Horatio LLC v. Maniscalco (In re Maniscalco)*, 2020 WL 6122656, at *1 (Bankr. M.D. Fla. Oct. 15, 2020) ("A false oath may involve a knowingly false statement or a deliberate omission in the debtor's petition or bankruptcy schedules.").

[142] Joint Ex. 5, Adv. Doc. No. 51-5, at 37.

[143] Joint Ex. 5, Adv. Doc. No. 51-5, at 14 – 16.

creditors, the Debtor indicated he had a storage unit with $100,000 in antiques and paintings,[144] but neither his schedules nor his Statement of Financial Affairs list a storage unit or $100,000 in antiques and paintings.[145] In his schedules, the Debtor listed a claim against Mr. Gilbert and others even though that claim had been dismissed.[146] He also scheduled a $75,000 judgment against George and Amy Kane when, in fact, the Kanes had a judgment against him.[147] There are more examples.

On paper, it would be easy to conclude the Debtor made these false statements or omissions knowingly or fraudulently. For instance, the Debtor's failure to disclose the transfer of his home to Dr. Gary is only made worse by the fact that the Debtor is still living in the home—apparently rent free.[148] And it would be easy to infer from the omission of valuable assets—say $100,000 worth of antiques and paintings in a storage unit (if, in fact, that is what the antiques and paintings are worth)—was done knowingly or fraudulently. But, having observed the Debtor's live testimony, and reviewing the transcripts from his 341 testimony, the Court concludes that the Debtor did not make the false statements or omissions knowingly or fraudulently.

---

[144] Joint Ex. 72, Adv. Doc. No. 53-22, p. 67, l. 6 – p. 68, l. 23.

[145] Joint Ex. 5, Adv. Doc. No. 51-5.

[146] Joint Ex. 5, Adv. Doc. No. 51-5, at 9; Joint Ex. 72, Adv. Doc. No. 53-22, p. 24, l. 25 – p. 26, l. 11; Joint Ex. 63, Adv. Doc. No. 53-13.

[147] Joint Ex. 5, Adv. Doc. No. 51-5, at 9; Joint Ex. 72, Adv. Doc. No. 53-22, p. 52, l. 25 – p. 53, l. 5.

[148] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 35, ll. 3 – 19.

In some cases, the Debtor explained the false statements. Take the transfer of his home to Dr. Gary. Although there is no question the Debtor transferred his property to Dr. Gary by a deed in lieu of foreclosure, the Debtor testified he believed he lost the home in a foreclosure action.[149] That's why he didn't disclose the deed in lieu of foreclosure as a "transfer."[150] The Debtor testified that he doesn't know what he signed and that he didn't understand that was considered a "transfer."[151] As for the purported "claim" against Mr. Gilbert, the Debtor appeared, from the Court's review of his 341 testimony, to sincerely believe the claim had not been dismissed.[152] There is no need for the Court to go example by example.

Observing the Debtor's testimony, three things became clear. First, because he only has a sixth-grade education and is not a native English speaker, it is obvious the Debtor has trouble understanding others when they speak unless they use simple words. It appears equally obvious the Debtor has trouble reading English. Second, perhaps owing to his lack of formal education and his difficulty with the English language, it is obvious the Debtor was confused about what was on his schedules.[153] Third, the Debtor appeared to the Court to be honest and forthright.

---

[149] Joint Ex. 72, Adv. Doc. No. 53-22, p. 11, l. 20 – p. 16, l. 18.

[150] Joint Ex. 53, Adv. Doc. No. 53-3, p. 17, l. 10 – p. 18, l. 11.

[151] Joint Ex. 72, Adv. Doc. No. 53-22, p. 15, ll. 5 – 12; p. 18, ll. 10 – 16.

[152] Joint Ex. 72, Adv. Doc. No. 53-22, p. 24, l. 25 – p. 26, l. 11.

[153] *See, e.g.,* Joint Ex. 72, Adv. Doc. No. 53-22, p. 10, l. 12 – p. 11, l. 7; p. 24, ll. 2 – 17; p. 52, l. 25 – p. 55, l. 13; p. 100, l. 15 – p. 101, l. 17; Joint Ex. 53, Adv. Doc. No. 53-3, p. 12, ll. 3 – 7.

This is not a case where the Debtor has a reckless indifference to the truth.[154] Based on the Debtor's 341 and trial testimony, and the Court's observation of his demeanor, the Court concludes the false statements and omissions here—even if there are many of them—are the result of ignorance or carelessness. "A false statement resulting from ignorance or carelessness is not one that is knowing and fraudulent."[155] The Court therefore concludes that the Plaintiffs' objection to the Debtor's discharge based on § 727(a)(4)(A) should be overruled.

### D. The Plaintiffs' objection to the Debtor's discharge based on § 727(a)(2) should be overruled.

Section 727(a)(2)(A) provides that this Court may deny the Debtor his discharge if, within one year before filing for bankruptcy, the Debtor (among other things) transferred or concealed his property with the intent to hinder, delay, or defraud a creditor or the Trustee.[156] Here, the Plaintiffs argue that the Debtor concealed property by failing to disclose on his schedules that he (i) transferred his home to Dr. Gary; (ii) pledged jewelry as collateral to Dr. Gary; (iii) stored jewelry at his son Mohammed's business; and (iv) owned a storage unit with (maybe as much as $100,000 worth of) antiques and paintings in it.

---

[154] *Baumann v. Post (In re Post)*, 347 B.R. 104, 112 (Bankr. M.D. Fla. 2006) ("A reckless disregard of both the serious nature of the information sought and the necessary attention to detail and accuracy in answering may rise to the level of fraudulent intent necessary to bar the discharge.") (citing *Jordan v. Bren (In re Bren)*, 122 F. App'x 285, 288 (8th Cir. 2005)).

[155] *In re Post*, 347 B.R. at 112.

[156] 11 U.S.C. § 727(a)(2)(A).

Courts in this circuit have found that a failure to disclose assets on bankruptcy schedules can constitute fraudulent concealment under § 727(a)(2)(A).[157] But the key is the debtor's intent. In other words, failure to disclose, alone, does not warrant denial of a discharge: a debtor's failure to disclose—i.e., concealment of—property must be with the *actual intent to hinder, delay, or defraud creditors*.[158]

Because debtors rarely admit to intending to hinder, delay, or defraud creditors, proof of actual intent may be based on circumstantial evidence or inferred from the debtor's conduct.[159] For example, in *In re Turpin*, the debtor failed to disclose on his bankruptcy schedules real property located in Michigan, as well as gold and diamonds, that he had previously disclosed in personal financial statements

---

[157] *See, e.g.*, *Sperling v. Hoflund (In re Hoflund)*, 163 B.R. 879, 883 (Bankr. N.D. Fla. 1993) (denying debtor a discharge under § 727(a)(2)(A) based on debtor's failure to list several pieces of personal property on his schedules); *M.R. Toupin, Inc. v. Turpin (In re Turpin)*, 142 B.R. 491, 495 (Bankr. M.D. Fla. 1992) (ruling that creditor met its burden under § 727(a)(2)(A) by showing debtor failed to disclose assets of substantial value, including real property, furniture, and gold and diamonds); *see also Stornawaye Fin. Corp. v. Hill (In re Hill)*, 387 B.R. 339, 350 (B.A.P. 1st Cir. 2008) (holding that bankruptcy court finding that debtor's failure to disclose tax refund on Schedule B constituted fraudulent concealment was not clearly erroneous); *Tranche 1 (SVP-AMC), Inc. v. Tan (In re Tan)*, 350 B.R. 488, 493 – 94 (Bankr. N.D. Cal. 2006) (ruling that failure to disclose interests in closely held corporation on schedules and Statement of Financial Affairs was grounds for denial of discharge under § 727(a)(2)(A)).

[158] 11 U.S.C. § 727(a)(2)(A) (providing that court shall grant a discharge unless debtor transfers, removes, destroys, mutilates, or conceals property "with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title"); *In re Hoflund*, 163 B.R. at 883 ("To deny discharge under § 727(a)(2), the movant must show that the debtor had actual intent to delay, hinder or defraud the creditors.") (citing *In re Turpin*, 142 B.R. 491, 495 (Bankr. M.D. Fla. 1992).

[159] *Spence v. Hintze (In re Hintze)*, 570 B.R. 369, 378 (Bankr. N.D. Fla. 2017) ("Because it is rare to have direct proof of intent to hinder, delay or defraud, it is proper to infer intent from circumstantial evidence.").

and on a surety bond application.[160] The court concluded that when "assets of substantial value are omitted from the Schedules, the conclusion that they were omitted purposely with fraudulent intent to conceal the assets may be warranted."[161]

In *In re Hoflund*, the chapter 7 trustee sought to deny the debtor's discharge based on the debtor's omission of personal property from his schedules.[162] There, the debtor failed to disclose a clock, a chandelier, hand-made drapes, a wedding ring, a set of Encyclopedia Britannica, a Georgia bank account, and stock ownership in a company. Although it was not necessarily troubled by the omission of any particular item, the court concluded that the debtor's "conduct in not disclosing numerous assets evidences a pattern of willful and reckless disregard to the truth sufficient to constitute actual intent to conceal assets."[163]

At one level, this case bears some resemblance to *Turpin* and *Hoflund*. Like the debtor in *Turpin*, the Debtor failed to disclose assets that (potentially) have significant value. And like the debtor in *Hoflund*, the Debtor omitted several items from his schedules. But, unlike in *Turpin* and *Hoflund*, the Court does not believe the Debtor here exhibited a reckless disregard for the truth.[164]

---

[160] 142 B.R. at 493 – 95.

[161] *Id.* at 496.

[162] 163 B.R. at 881 – 82.

[163] *Id.* at 883.

[164] *Id.* ("While it cannot be said that the omission of each item alone is sufficient to deny discharge, taken together under the circumstances of this case the Court is convinced that a pattern of omission

As discussed above, the Court had the opportunity to observe the Debtor over two days of testimony.[165] The Court also reviewed transcripts of the Debtor's testimony at the section 341 meeting of creditors,[166] as well as his initial and continued Rule 2004 examination.[167] Having heard the Debtor's testimony and observed his demeanor, the Court did not see a reckless disregard for the truth. What the Court observed was someone with a sixth-grade education; someone who is unsophisticated; someone who has trouble reading English; someone who has trouble understanding others when they speak unless the other person uses simple words; someone who was easily confused; someone who was earnest; and someone who, despite the omissions on the schedules, was attempting to be honest and forthright.

In light of the Debtor's testimony, the Court concludes the Plaintiffs failed to prove that the Debtor concealed property with the actual intend to hinder, delay, or defraud his creditors or the Chapter 7 Trustee. The Court therefore concludes the Plaintiffs' objection to the Debtor's discharge based on § 727(a)(2)(A) should be overruled.

---

arises which indicates a reckless disregard for the truth."); *In re Turpin*, 142 B.R. at 495 ("When a Debtor makes numerous omissions in his Statement of Affairs and Schedules, the omissions together may constitute a pattern demonstrating a reckless disregard for the truth.").

[165] Trial Tr. Vol. I, Adv. Doc. No. 57-1, p. 34, l. 16 – p. 116, l. 2; Trial Tr. Vol. III, Adv. Doc. No. 57-3, p. 49, l. 7 – p. 98, l. 25.

[166] Joint Ex. 72, Adv. Doc. No. 53-22.

[167] Joint Exs. 53 & 54, Adv. Doc. Nos. 53-3 & 53-4.

### III.    Conclusion

Except for being prosecuted for a bankruptcy crime, "[d]enial of a discharge is the ultimate penalty for a debtor who seeks protection under the Bankruptcy Code."[168] Here, that ultimate penalty is not warranted. By separate order, the Court will enter a final judgment in favor of the Debtor on the Plaintiffs' objection to his discharge under Bankruptcy Code §§ 727(a)(2), (a)(3), (a)(4), and (a)(5).

---

Attorney Benjamin G. Martin is directed to serve a copy of these Findings of Fact and Conclusions of Law on all interested parties who are non-CM/ECF users and to file a proof of service within three days of entry of these Findings of Fact and Conclusions of Law.

---

**Benjamin G. Martin, Esq.**
**Law Offices of Benjamin Martin**
  *Counsel for the Debtor*

**Nathan A. Wheatley, Esq.**
**Trial Attorney, Office of the U.S. Trustee, Region 21**
  *Counsel for Nancy J. Gargula, United States Trustee, Region 21*

**Lynn Welter Sherman, Esq.**
**Trenam Law**
  *Counsel for the Chapter 7 Trustee*

**Alberto F. Gomez, Jr., Esq.**
**Johnson Pope Bokor Ruppel & Burns, LLP**
  *Counsel for Wilson Enterprises International, Inc.*

---

[168] Hon. Joan N. Feeney (Ret.), Hon. Michael G. Williamson & Michael J. Stepan, *Bankruptcy Law Manual* § 10:27 at 679 (5th ed. 2021).